# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| BLEU COPAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:17-cv-01447 |
| ) | Judge Aleta A. Trauger |
| BILL HASLAM, in his official capacity as ) | |
| GOVERNOR OF THE STATE OF ) | |
| TENNESSEE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Pending before the court is a Motion to Dismiss (Docket No. 9), filed by the defendant, Governor Bill Haslam, to which the defendant, Bleu Copas, has filed a Response (Docket No. 17) and Governor Haslam has filed a Reply (Docket No. 20). For the reasons discussed herein, the motion will be granted in part.

## BACKGROUND[1]

Copas is a gay Tennessean residing in Anderson County. He has a Master's degree in counseling and works as a state-certified Peer Recovery Specialist. Also a distinguished army veteran, Copas was honorably but involuntarily discharged in 2006 pursuant to "Don't Ask, Don't Tell," an official military policy that prohibited openly gay Americans from serving in the armed forces. Copas suffers from Post-Traumatic Stress Disorder ("PTSD") and Chronic Adjustment Disorder ("CAD"), for which he saw a therapist from the time of his discharge in 2006 until February 2016, when his therapist retired.

---

[1] The facts are viewed in the light most favorable to Copas.

1

On May 2, 2016, Governor Bill Haslam signed into law Tennessee House Bill 1840, now codified as Tennessee Code Annotated Section 63-22-302 and known colloquially as the "Therapist Bill" (hereinafter referred to as the "Bill"). The Bill reads as follows:

> (a) No counselor or therapist providing counseling or therapy services shall be required to counsel or serve a client as to goals, outcomes, or behaviors that conflict with the sincerely held principles of the counselor or therapist; provided, that the counselor or therapist coordinates a referral of the client to another counselor or therapist who will provide the counseling or therapy.
>
> (b) The refusal to provide counseling or therapy services as described in subsection (a) shall not be the basis for:
>
> > (1) A civil cause of action; or
> >
> > (2) Criminal prosecution.
>
> (c) Subsections (a) and (b) shall not apply to a counselor or therapist when an individual seeking or undergoing counseling is in imminent danger of harming themselves or others.

Tenn. Code Ann. § 63-22-302. The Bill defines the relevant services as follows:

> For purposes of this part, "counseling or therapy services" means assisting an individual, who is seeking or engaged in the counseling relationship in a private practice setting, in a manner intended to facilitate normal human growth and development, using a combination of mental health and human development principles, methods, and techniques, to achieve mental, emotional, physical, social, moral, educational, spiritual, or career development and adjustment throughout the individual's life span.

Tenn. Code Ann. § 63-22-301. Copas alleges that the Bill was conceived as a means to protect Evangelical Christian counselors. In support, he claims: 1) Tennessee has a long history of state-sponsored discrimination against the LGBT community; 2) earlier versions of the Bill protected "sincerely held religious belief[s]" of counselors or therapists, but the Bill's final version—which became law—substituted the phrase "sincerely held principle" for "sincerely held religious belief"; and 3) no proponent of the Bill nor member of the Tennessee legislature has

2

identified a "sincerely held principle" that the Bill was meant to protect other than a religious belief.

Copas alleges that he has suffered stigmatic and psychological injury from the Bill. He suffers from feelings of marginalization and exclusion and believes that the State of Tennessee deems him unworthy of guaranteed access to services. He desires to re-engage in therapy, but the Bill's stigmatic effects and his fear of discrimination have prevented him from doing so. On November 13, 2017, Copas filed suit, alleging that the Bill is unconstitutional under the First Amendment's Establishment Clause and the Fourteenth Amendment's Equal Protection Clause.[2] He seeks declaratory relief that the Bill is unconstitutional and injunctive relief enjoining Governor Haslam from enforcing it. On December 12, 2017, Governor Haslam filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Governor Haslam contends that Copas lacks standing because he alleges only a speculative future injury and that Copas is not entitled to equitable relief because he cannot demonstrate a real or immediate threat.

## **LEGAL STANDARD**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must

---

[2] Copas filed an Amended Complaint the following day. The court's analysis relies on the Amended Complaint.

determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

## **ANALYSIS**

In order to establish subject matter jurisdiction, the plaintiff must show, among other things, that he has standing to litigate a particular claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). Standing is a "threshold determinant[ ] of the propriety of judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

The elements of standing are threefold—the plaintiff must establish (1) injury in fact, (2) causation, and (3) redressability. *Steel Co.*, 523 U.S. at 103. The injury-in-fact component requires the plaintiff to "allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal citations omitted). For an injury to be sufficiently distinct, or "particularized," it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) (internal quotation marks omitted). For an injury to be sufficiently palpable, or "concrete," it "must be *de facto*; that is, it must actually exist." *Id.*

When a plaintiff seeks injunctive relief, the plaintiff must demonstrate that there is a non-speculative, imminent threat of ongoing or repeated injury to establish that there is a redressable injury-in-fact. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 966 (6th Cir. 2009)). "Redressability . . . requires 'that prospective relief will remove the harm,' and the plaintiff must show 'that he personally would benefit in a tangible way from the court's intervention.'" *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 670 (6th Cir. 2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 505, 508 (1975)).

In determining whether a plaintiff has standing, "the court must be careful not to decide the question on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013); *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd by District of Columbia v. Heller*, 554 U.S. 570 (2008) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim.").

### i. Establishment Clause

The Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Conner, J. concurring). The Supreme Court interprets the Establishment Clause "to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 590–91 (1989). For purposes of an Establishment Clause claim, "plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion." *Establishment Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 129 (2011). Standing analyses thus must be "tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer." *Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1086 (4th Cir.1997). "Consequently, plaintiffs have been found to possess standing when they are spiritually affronted as a result of direct and unwelcome contact with an alleged religious establishment within their community. *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 605 (4th Cir. 2012) (internal citations and quotation marks omitted). "[S]o far the [Supreme] Court has announced no reliable and handy principles of analysis" for determining that an Establishment Clause injury is sufficient. *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489–90 (2d Cir. 2009), *cert. denied*, 559 U.S. 971 (2010). "Lower courts are left to find a threshold for injury and determine somewhat arbitrarily whether that threshold has been reached . . . . In short, there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context." *Id*.

Governor Haslam argues that Copas's alleged injury is insufficiently concrete and particularized to confer standing. The court will address each requirement in turn.

**A. Concreteness**

Belying its sturdy namesake, the concreteness requirement often leaves courts on flimsy conceptual ground. As the Supreme Court recently explained:

> When we have used the adjective "concrete," we have meant to convey the usual meaning of the term—"real," and not "abstract" . . . . "Concrete" is not, however, necessarily synonymous with "tangible." Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.

*Spokeo*, 136 S.Ct. at 1549 (citing Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)). But distinguishing the real intangible from the abstract intangible can be difficult. "The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context . . . because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007).

Copas claims that he has been marginalized by the Bill, made to feel ostracized and unworthy as a non-adherent to the religiously-based, anti-LGBT preference he alleges the Bill endorses.[3] Governor Haslam contends that this is not a concrete injury. He cites *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), a seminal Establishment Clause case, for the proposition that psychological injury alone

---

[3] Because Copas's alleged marginalization is a continuous, ongoing injury, the court need not address Governor Haslam's contention that Copas is not entitled to equitable relief under *United States v. Lyons*. *Lyons* requires a demonstration of real or immediate threat to obtain equitable relief. *Lyons*, 461 U.S. at 111. Because Copas's alleged injury constitutes a present harm, injunctive relief is available to him.

7

cannot establish standing. In *Valley Forge*, a non-local advocacy group and its employees sued to prevent the transfer of federal property in Pennsylvania to a Christian nonprofit intending to use the land for a secular educational institution. The Court found that the respondents failed "to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees" and held that injury "[in]sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Id*. at 485–86. But courts have not interpreted *Valley Forge* as foreclosing all Establishment Clause claims grounded in psychological injury. In fact, since *Valley Forge*, the Supreme Court itself has heard Establishment Clause cases based on a multitude of psychological injuries:

> Standing was adequate for jurisdiction in Establishment Clause cases in the Supreme Court in the following contexts: prayer at a football game, a crèche in a county courthouse or public park, the Ten Commandments displayed on the grounds of a state capitol or at a courthouse, a cross display at a national park, school prayer, a moment of silence at school, Bible reading at public school, and a religious invocation at a graduation. No one was made to pray, or to pray in someone else's church, or to support someone else's church, or limited in how they prayed on their own, or made to worship, or prohibited from worshiping, in any of these cases. **The Court treated standing (and therefore the concreteness element of standing) as sufficient in all of these cases, even though nothing was affected but the religious or irreligious sentiments of the plaintiffs.**

*Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1049–50 (9th Cir. 2010) (emphasis added). The Sixth Circuit has explicitly adopted this more expansive approach:

> [W]e do not take the Supreme Court's decision in [*Valley Forge*] to stand for the proposition that psychological injury can never be a sufficient basis for the conferral of Article III standing . . . . Although the Supreme Court explicitly stated that injuries that merely amount to "the psychological consequence presumably

8

> produced by observation of conduct with which one disagrees" are
> insufficient to confer standing under Article III, we believe that
> this statement cannot be read without taking the particular
> circumstances of that case into account.

*Am. Civil Liberties Union of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 489 n.3 (6th Cir. 2004). Accordingly, the Sixth Circuit has found standing based on psychological injury incurred from seeing a courtroom poster of the Ten Commandments,[4] from future encounters with a proposed Ten Commandments monument on the state capitol grounds,[5] and from passing a portrait of Christ in a public school hallway.[6]

*Spokeo* instructs that we look to history to determine whether an intangible harm constitutes injury in fact because "the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice . . . ." Courts should thus "consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S.Ct. at 1549. The court sees no meaningful distinction between the marginalization alleged by Copas, who feels that the state has deemed him unworthy of equal status because of his non-adherence to Evangelical beliefs,[7] and that suffered by Mormon and Catholic high school students when their majority-Baptist school district implemented a policy allowing a pregame prayer at football games. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (finding policy violated Establishment clause). Nor does the court see significant difference between Copas's marginalization and that of the lawyer practicing under the Ten

---

[4] *Ashbrook.*, 375 F.3d at 390.
[5] *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002).
[6] *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679, 682–83 (6th Cir. 1994).
[7] "[T]he Bill impermissibly advances the particular (and far from universal) religious disapproval of LGBT people." (Docket No. 2 at 12.)

9

Commandments poster, *Ashbrook.*, 375 F.3d at 390, nor that of the student made to see a representation of Jesus, *Washegesic* 33 F.3d at 681. Copas's alleged harm is comparable to those psychological injuries of litigants whose cases the Supreme Court and Sixth Circuit have heard.

The Ninth Circuit reached a similar outcome in *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*. There, a group of San Francisco Catholics sued the city and county for adopting an official resolution denouncing a Cardinal's directive that the Archdiocese of San Francisco should not place children for adoption in homosexual households. *Catholic League*, 624 F.3d at 1047. The court found standing on the well-reasoned grounds that the Catholic citizens' psychological harm was indistinguishable from that of myriad other Establishment Clause plaintiffs:

> A "psychological consequence" does not suffice as concrete harm where it is produced merely by "observation of conduct with which one disagrees." But it does constitute concrete harm where the "psychological consequence" is produced by government condemnation of one's own religion or endorsement of another's in one's own community. For example, in the school prayer and football game cases, nothing bad happened to the students except a psychological feeling of being excluded. Likewise in the crèche and Ten Commandments cases, nothing happened to the non-Christians, or to people who disagreed with the Ten Commandments or their religious basis, except psychological consequences. What distinguishes the cases is that in *Valley Forge*, the psychological consequence was merely disagreement with the government, but in the others, for which the Court identified a sufficiently concrete injury, the psychological consequence was exclusion or denigration on a religious basis within the political community.

*Id.* at 1052. This approach is consistent with the principles underlying the unique treatment of injury in Establishment Clause cases:

> Feelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a

> message to non-adherents of a particular religion "that they are
> outsiders, not full members of the political community."

*Moss*, 683 F.3d at 607 (quoting *McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 (2005)). With this objective in mind, the court finds that Copas's alleged marginalization is sufficiently concrete to confer standing for his Establishment Clause claim.

### B. Particularization

The Court in *Valley Forge* found a lack of standing because the plaintiff had not "personally . . . suffered some actual or threated injury." *Valley Forge*, 454 U.S. at 472. As the Sixth Circuit has explained, *Valley Forge* is best understood as a decision hinging on particularization:

> [T]he Supreme Court's decision that the *Valley Forge* plaintiffs
> lacked standing because its members had suffered no direct injury
> was based, in large part, on the fact that although the property
> transfer occurred in Chester County, Pennsylvania, [] the named
> plaintiffs resided in Maryland and Virginia and "learned of the
> transfer through a news release." Accordingly, this circuit and
> other circuits have read Valley Forge's language as depending in
> no small part on the directness of the harm alleged.

*Ashbrook*, 375 F.3d at 489 n.3. Courts have thus approached the particularization requirement for alleged Establishment Clause violations as testing whether a plaintiff "is feeling the direct, painful effects . . . in his everyday life." *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 585 (4th Cir.), *as amended* (May 31, 2017), *as amended* (June 15, 2017), *cert. granted*, 137 S. Ct. 2080 (2017), *and vacated and remanded sub nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) ("*IRAP I*"). This approach dovetails with "the essence of the standing inquiry," which is "whether [plaintiffs] have alleged such a personal stake in the outcome of the controversy" so as to ensure necessary adverseness to "illuminate[s] difficult constitutional questions." *Larson v. Valentine*, 456 U.S. 228, 238–39 (1982).

11

Copas adequately alleges that the Bill has directly affected him. He cites "his feelings of marginalization and exclusion as a result of the Therapist Bill" which "directly and personally impact [him as] a gay man suffering from PTSD and Chronic Adjustment disorder who has sought psychological counseling in the past but is now discouraged from doing so . . . ." (Docket No. 17 at 9.) He also claims that, as a member of the LGBT community, the Bill makes him feel "not worthy of being guaranteed counseling services" from a counselor of his choosing. (Docket No. 2 at 8.) This is sufficient to satisfy the particularization requirement. *See Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 261 (4th Cir. 2018), *as amended* (Feb. 28, 2018) ("*IRAP 2*") ("Plaintiffs here have alleged a violation of their own Establishment Clause rights, and they have presented evidence that the violation is particular to them: they have articulated specific feelings of marginalization and exclusion . . . .") (internal quotation marks omitted). The *IRAP* cases—dealing with the Executive Branch's travel bans restricting immigration from certain countries, most of which are Muslim-majority—are instructive. The Fourth Circuit found in *IRAP 2*[8] that Muslim plaintiffs who felt, amongst other things, "insulted," "demeaned," "unwanted," and "different" as a result of the bans had suffered "personal, particularized injuries cognizable under Article III . . . ." *Id*. at 260.

Critical to the Fourth Circuit's finding was the fact that the plaintiffs suffered harm in their own homes, businesses, streets, and neighborhoods. *See id*. The court explained that, "unlike the plaintiffs in *Valley Forge*, Plaintiffs here have not 'roam[ed] the country in search of governmental wrongdoing.' Instead, the purported government wrongdoing has found them." *Id*. at 262 (internal citation omitted). The Sixth Circuit places similar emphasis on whether an

---

[8] *IRAP* 1 addressed the second iteration of the Executive Branch's travel ban, while *IRAP 2* addressed the third iteration. The Executive Branch voluntarily vacated the first iteration. *See IRAP 2*, 883 at 251.

alleged Establishment Clause injury is suffered at home. *See Washegesic*, 33 F.3d at 683 ("The practices of our own community may create a larger psychological wound than someplace we are just passing through."). Other circuits have followed suit. *See, e.g., Am. Civil Liberties Union of Ill. v. Cty. of St. Charles*, 794 F.2d 265, 268 (7th Cir. 1986) ("Maybe it ought to make a difference if (as here) a plaintiff is complaining about the unlawful establishment of a religion by the city, town, or state in which he lives, rather than about such an establishment elsewhere."), *cert. denied*, 479 U.S. 961 (1986). Copas is a resident of Tennessee. He did not set off in search of the Bill, but rather was subjected to its alleged effects in his home state.

Further strengthening Copas's argument for particularization is the fact that he has changed his behavior as a result of his stigmatic and psychological injuries. *See* Docket No. 2 at 2 ("Copas desires to re-engage in therapy, but fears that a therapist will refuse to treat him because of his sexuality."); Docket No. 17 at 3 ("[H]is fear of being rejected by a counselor because of his sexual preference prevents him from reengaging in therapy."). "For purposes of standing, these change[s in] personal conduct on account of allegedly unlawful conduct are indicative of injury." *Moss*, 683 F.3d at 607; *see Am. Civil Liberties Union of Ill.*, 794 F.2d at 269 (holding that one plaintiff has standing because "she detours from her accustomed route to avoid the [lighted] cross").

In *Moss*, the Fourth Circuit held that a student and parent who received a letter about an opportunity for high school class credit for off-campus Christian religious instruction had standing to sue. Haslam contends that *Moss* supports his position, because another student and parent who did not receive letters were found not to have standing. This, according to Haslam, shows that Copas has not suffered a sufficiently particular injury, because he has knowledge of the alleged discriminatory policy but has not been personally confronted by it. Haslam's reading

13

of *Moss* is incomplete. Failure to receive the letter was only one factor the court examined in denying standing to those plaintiffs:

> Tillett has not suggested, however, that either she or her child altered conduct as a result of the released time policy. Tillett's allegations amount to little more than simple disagreement with the wisdom of the School District's policy. Tillett and her child do not suggest that they were the targets or victims of this alleged religious intolerance—indeed, they are Christians. Thus they are seeking to vindicate, not their own rights, but the rights of others.

*Moss*, 683 F.3d at 606. Unlike the Tilletts, Copas has changed his behavior as a result of his injury. Moreover, unlike the Tilletts, Copas is a member of the class allegedly discriminated against by the Bill.[9] He is seeking to vindicate his own rights, rather than the rights of others. His injury is not "based on a generalized interest of all citizens in the government's complying with the Establishment Clause . . ," *Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) (internal quotation marks omitted), but rather on personal harms inflicted by a policy he alleges discriminates against him, specifically, as a gay Tennessean in continuing need of therapy.[10]

---

[9] Governor Haslam makes various arguments to the effect that the Bill does not actually discriminate against homosexuals. The Bill need not discriminate on its face to inflict an Equal Protection injury. *See IRAP 2*, 883 F.3d at 266 ("But even if the Proclamation's stated objective is religiously neutral, that cannot be dispositive as the entire premise of our review . . . is that even facially neutral government actions can violate the Establishment Clause.") (internal quotation marks omitted). Regardless, whether or not the Bill violates the Establishment Clause is a merits question not properly addressed on an inquiry into standing. Copas has alleged a colorable Establishment Clause violation. No further merits analysis is proper at this stage.

[10] Governor Haslam relies heavily on *Barber*, for which this court stayed this case at Copas's request. In *Barber*, the Fifth Circuit rejected standing for an Establishment Clause claim based on stigmatic and psychological injuries allegedly caused by a Mississippi statute similar to the Bill. *Barber v. Bryant*, 860 F.3d at 355. The court found that standing based on those injuries would be "indistinguishable" from standing based on a generalized interest because "an individual . . . cannot confront statutory text." *Id*. at 353. This categorical approach hinges entirely on the assumption that one can only "confront" an instance of state expression by seeing or hearing it. But this assumption has no basis in the Establishment Clause or its underlying concerns. Being physically exposed by proximity to a prayer or a statue is one form of confrontation. Being forced to acknowledge and consider a potential barrier placed between

That he has not been rejected services as the result of the Bill does not mean that he has suffered no concrete, particularized injury by its passage.

> [T]he Constitution also requires that we keep in mind the myriad, subtle ways in which Establishment Clause values can be eroded, and that we guard against other different, yet equally important, constitutional injuries. One is the mere passage by the District of a policy that has the purpose and perception of government establishment of religion.

*Doe*, 530 U.S. at 314 (internal citation and quotation marks omitted). The court finds that Copas has satisfied Article III's standing requirements for his Establishment Clause claim.

### ii. Equal Protection

The Fourteenth Amendment mandates that no state "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "[T]he Equal Protection Clause requires the consideration of whether the classifications drawn by any statute constitute an arbitrary and invidious discrimination." *Loving v. Virginia*, 388 U.S. 1, 10 (1967). The injury-in-fact analysis for Equal Protection claims differs from Establishment Clause claims: "*Allen* and its progeny make clear that those same types of injuries [that confer Establishment Clause standing] are not a basis for standing under the Equal Protection Clause—that is, exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case. *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir.), *cert. denied*, 138 S. Ct. 468 (2017) (citing *Allen v. Wright*, 468 U.S. 737, 755 (1984)). The analyses are different because "the injuries protected against under the Clauses are different . . . . [T]he gravamen of

---

oneself and one's needed medical coverage is another. Neither is more particularized than the other.

an equal protection claim is differential governmental treatment, not differential governmental messaging." *Id*.

Copas alleges that he "faces an actual and imminent threat of discrimination" (Docket No. 2 at 8) and that he "has not re-engaged with a counselor because of his fear that the counselor will refuse to treat him due to the counselor's undisclosed religious beliefs against homosexuality" (Docket No. 17 at 5). To have standing for an equal protection claim based on the threat of discrimination, Copas must satisfy the injury-in-fact requirement's imminence component. "[T]hreatened injury must be *certainly impending* to constitute injury in fact" and . . . "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). Copas fails to show that rejection from a counselor based on his sexuality is certainly impending. He pleads that he "desires to re-engage in therapy, but fears that a therapist will refuse to treat him . . . ." (Docket No. 2 at 2.) . But he pleads no specific plans to seek treatment in the near future. Even if the court were to grant that Copas is likely to seek treatment, there is no factual basis to find rejection certainly impending. Copas does not, for example, plead facts indicating that a counselor from whom he expects to seek treatment was a proponent of the Bill, or has expressed animus towards homosexuals, or even is an Evangelical Christian. The imminence requirement "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S at 409. Absent specific facts supporting a likelihood of discriminatory rejection, the court will not assume that the state's therapists will be likely to discriminate, merely because it is lawful for them to do so. *See id.* at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

Without an imminent threat of discriminatory treatment, Copas cannot bring an Equal Protection claim based on stigmatic injury. *See Moore*, 853 at 250 (holding that Equal Protection claims based on stigma must be accompanied by allegations of discriminatory treatment); *see also Nat'l Ass'n for the Advancement of Colored People v. Horne*, 626 F. App'x. 200, 201 (9th Cir. 2015) ("Plaintiffs have not alleged that their members were personally denied equal treatment under *Allen*, as stigmatic injury caused by being a target of official discrimination is not itself a personal denial of equal treatment."). And because rejection is not certainly impending, Copas's unwillingness to reengage in therapy due to the Bill is not an independent injury sufficient to confer standing. The Court in *Clapper* explicitly rejected this line of argument:

> Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.

*Clapper*, 568 U.S. at 416. Copas therefore does not have standing to bring an equal protection claim based on the threat of discriminatory rejection by a therapist, or any attendant psychological effects or behavioral changes resulting from that perceived threat.

Copas also alleges several additional Equal Protection violations. He incorrectly claims that the Bill does not distinguish between government-employed counselors and private counselors. It clearly does. *See* Tenn. Code Ann. § 63-22-301 ("For purposes of this part, 'counseling or therapy services' means assisting an individual, who is seeking or engaged in the counseling relationship **in a private practice setting**") (emphasis added). Copas's claim that the Bill creates a barrier for him to receive government-provided mental health care is therefore

17

meritless. He also claims that the Bill makes it more difficult to obtain a $60 fee-waiver offered by the state for undergoing pre-marital therapy by a licensed counselor. But Copas has not alleged that he is engaged to be married, considering getting married, or even in a long-term relationship. "[T]hreatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks omitted). Copas's failure to plead any facts indicating any impending difficulty in obtaining pre-marital therapy dooms his claim under this theory.

In addition to claims brought as a potential client, Copas brings an Equal Protection claim in his capacity as a state-certified Peer Recovery Specialist with a Master's degree in counseling. Copas claims that the Bill "prefers Evangelical Christian counselors who disapprove of homosexuals over Copas and other counselors who don't share those beliefs by allowing the Evangelical Christian Counselors to graduate from public universities and obtain licensure without complying with all of the ACA's Coded [sic] of Ethics." (Docket No. 17 at 6.) Specifically, he claims that the Bill violates Section C.5 of the American Counseling Association ("ACA")'s Code of Ethics, which prohibits counselors from "engag[ing] in discrimination against prospective or current clients . . . based on gender, gender identity, sexual orientation, [and] marital/partnership status." (Docket No. 2 at 6.) Copas alleges that the Bill "requires a Tennessee public university to confer a degree upon, and the State of Tennessee to license, a counselor who refuses to abide by Section C.5, but provides no protections to a potential counselor who refuses to abide by any other section in the ACA's Code of Ethics." (*Id*.) Copas alleges he is harmed by this inequity because, unlike Evangelical Christian Counselors, he "could not obtain his Master's Degree or a State-issued [sic] license in counseling without complying with Section C.5 . . . ." (Docket No. 17 at 5.)

18

To support his theory that this alleged inequity confers standing for his Equal Protection claim, Copas relies on the Supreme Court's decision in *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993), in which the Court held that, for Equal Protection Clause claims:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

(Docket No. 17 at 7) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 656 U.S. at 666). But that decision stands for the proposition that, for Equal Protection claims such as Copas's, "the 'injury in fact' is the inability to compete on an equal footing . . . ." *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 656 U.S. at 666; *see also Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002) ("If, however, the plaintiffs allege some kind of on-going constitutional violation and seek forward-looking relief to level the playing field, then the plaintiffs need only show that the [discriminatory] preference hinders their ability to "compete on an equal footing.").

According to Copas's pleadings, he has already obtained a master's degree in counseling and state certification to work as a peer recovery specialist. He does not allege that he is currently seeking or planning to seek any licensure from the state of Tennessee. Even accepting Copas's premise that Evangelical students pursuing degrees in counseling or therapists seeking licensure enjoy easier access to those benefits by not having to conform with Section C.5, Copas cannot establish standing to challenge these claims because he does not allege that he himself is seeking those benefits. There can be no hindrance to competition on an equal footing when Copas has already obtained or is not attempting to obtain the benefits at issue.

19

Thus, the only cognizable basis for Copas's claim would be his status as a state-certified Peer Recovery Specialist. (Docket No. 2 at 2.) But his arguments with regard to the ACA's Code of Ethics deal exclusively with state licensure, not certification. *See, e.g.¸* (Docket No. 2 at 6.) (alleging the Bill "requires . . . the State of Tennessee to license[] a counselor who refuses to abide by Section C.5, but provides no protections to a potential counselor who refuses to abide by any other section in the ACA's Code of Ethics."). Copas does not allege that he plans to seek renewal of his Peer Recovery Specialist certification. Regardless, Tennessee does not require compliance with the ACA's Code of Ethics for Peer Recovery Specialist certification—that program has its own Code of Ethics with which compliance is required for certification.[11] Copas's certification is thus not implicated by any inequality stemming from conflict between the Bill and the ACA Code of Ethics.

## CONCLUSION

For the foregoing reasons, Haslam's Motion to Dismiss is hereby **GRANTED** in part. Copas's Equal Protection claims are dismissed due to lack of standing. With regard to Copas's Establishment Clause claim, Haslam's Motion is hereby **DENIED**.

It is so **ORDERED**.

ENTER this 25th day of May 2018.

ALETA A. TRAUGER
United States District Judge

---

[11] *See* https://www.tn.gov/content/dam/tn/mentalhealth/documents/Certified_Peer_Recovery_Specialist_Handbook_December_20_2016.pdf.