IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BLEU COPAS, ) | |
| ) | |
| Plaintiff, ) | Case No.: 3:17-cv-01447 |
| v. ) | |
| ) | |
| BILL HASLAM, in his official capacity ) | |
| as GOVERNOR OF THE STATE OF ) | |
| TENNESSEEE ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

Through his counsel of record, and for his Memorandum in Support of his Motion for Summary Judgment, Plaintiff, Bleu Copas ("Copas"), states that:

## I.   INTRODUCTION

In 2015, a group of anti-LGBTQ special interest groups with a solution to a non-existent problem descended on the Tennessee General Assembly to advocate for legislation which empowers certain Christian counselors and therapists to rely on their religious beliefs and shirk their ethical obligations by refusing to provide therapy to members of the LGBTQ community.[1] The efforts of these special interest groups quickly led to the General Assembly's consideration (and passage) of House Bill 1840 and Senate Bill 1556, which became known as the "Therapist Bill." When Governor Haslam signed the Therapist Bill into law, "Tennessee became the first state to allow counselors and therapists in private practice to deny services to any client based on the therapist's 'sincerely held principles.'" (Pl.'s Stat. Mat. F., ¶ 4).

---

[1] Representative Matthew Hill made this observation on January 27, 2016; as did Representative Clemmons on March 30, 2016. (Vol. I at 219:14-223:3; Vol. II at 311:6-12).

The Therapist Bill has no secular purposes, promotes the religious rights of certain individuals over the religious (or non-religious) rights of others, and fosters excessive government entanglement with religion. Therefore, it violates the First Amendment's Establishment Clause, as applied to the states through the Due Process Clause of the Fourteenth Amendment, and Copas respectfully requests that the Court find that it is unconstitutional.

## II. STATEMENT OF RELEVANT FACTS

Tennessee is one of several states that adopts the Code of Ethics promulgated by the American Counseling Association (the "ACA"). (Pl.'s Stat. Mat. F., ¶ 1). In 2014, the ACA amended its Code of Ethics to provide, in relevant part:

> **A.11.b. Values Within Termination and Referral** Counselors refrain from referring prospective and current clients based solely on the counselor's personally held values, attitudes, beliefs, and behaviors. Counselors respect the diversity of clients and seek training in areas in which they are at risk of imposing their values onto clients, especially when the counselor's values are inconsistent with the client's goals or are discriminatory in nature.

(Id. at ¶ 2).[2] The plain language of this rule demonstrates that therapists maintain their ability to make referrals so long as the referral is not based "solely on the counselor's personally held values, attitudes, beliefs, and behaviors."[3] (Id.) As such, there is no prohibition against referral when, for example (and without limitation), the therapist:

---

[2] The previous Rule A.11.b. provided:

> If counselors determine an inability to be of professional assistance to clients, they avoid entering or continuing counseling relationships. Counselors are knowledgeable about culturally and clinically appropriate referral resources and suggest these alternatives. If clients decline the suggested referrals, counselors should discontinue the relationship.

(Pl.'s Stat. Mat. F., ¶ 3).

[3] Unfortunately, the General Assembly largely ignored the term "solely" when deliberating the Therapist Bill. (Pl.'s Stat. Mat. F., ¶ 72).

- has a good-faith belief that referral is in the patient's best interest;

- makes a referral to someone with more expertise in the patient's needs; or

- believes he or she is not appropriately trained or otherwise competent to treat the patient.[4]

(Id.) Nevertheless, Tennessee's General Assembly claimed that the 2014 revision to the ACA's Code of Ethics prohibits the free exercise of religion[5] and responded to this revision by passing

---

[4] In fact, Rule A.11.a specifically requires counselors to make referrals if they lack the competence to be of professional assistance to a patient. (Pl.'s Stat. Mat. F., ¶ 22). Interestingly, Mr. Graham testified to the Tennessee General Assembly that, prior to the 2014 revision to Rule A.11.b, he would refer patients to other therapists if he believed his core beliefs rendered him incompetent to work with a patient and that the patient would benefit from the referral. (Id. at ¶ 50). He also testified that the 2014 revisions to the ACA's Code of Ethics allow him to make a referral if he believes the patient will benefit from better expertise of a fellow counselor. (Id. at ¶ 51). Interestingly, Dr. Susan Hammonds-White and Kim Speakman, both of whom are members of the Professional Counselors Health-Related Board (Dr. Hammonds-White is the President) which supervises marriage, family, and pastoral therapists, testified in opposition of the Therapist Bill, gave substantively identical testimony. (Id. at ¶¶ 23-24).

[5] For example, while debating what ultimately became the Therapist Bill, Representative Dan Howell stated:

> . . . I think it's unfortunate that we are entering a time when we no longer want any kind - - anything to say or anything to do about religion in the public arena. In fact, our First Amendment says: Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.
>
> That's exactly what this Code of Ethics 2014 does. It prohibits the free exercise thereof. I believe - - and I have David Fowler who is here to testify on the legal aspect of it. I'm not a lawyer. But I believe that it is also, and I believe there's case history to prove it, that it's also in violation of Title VII of the Civil Rights Act of 1964, which expressly forbids any kind of discrimination against race, color, creed, or religion.
> So I think for us to say that we don't want - - and we're concerned about religion in the marketplace in the public forum, to me it makes me sad.

(Pl.'s Stat. Mat. F., ¶ 26).

the Therapist Bill, which is codified at Tennessee Code Annotated Section 63-22-302[6] and provides:

> (a) No counselor or therapist providing counseling or therapy services shall be required to counsel or serve a client as to goals, outcomes, or behaviors that conflict with the sincerely held principles of the counselor or therapist; provided that the counselor or therapist coordinates a referral of the client to another counselor or therapist who will provide the counseling or therapy.
>
> (b) The refusal to provide counseling or therapy services as described in subsection (a) shall not be the basis for:
>
>> (1) A civil cause of action; or
>>
>> (2) Criminal prosecution.
>
> (c) Subsections (a) and (b) shall not apply to a counselor or therapist when an individual seeking or undergoing counseling is in imminent danger of harming themselves or others.

(Pl.'s Stat. Mat. F., ¶ 12).

From its January 19, 2016, inception until March 16, 2016, Section (a) of the House version of Therapist Bill stated that it protected the counselors' "sincerely-held religious beliefs" rather than their "sincerely held principles." (Id. at ¶ 14). Despite the change in language, as noted by the Therapist Bill's sponsor, Representative Howell, and the first witness to testify in favor of the Therapist Bill on its second day of deliberations, David Fowler of Family Action Council of Tennessee ("FACT"), its purpose continued to be to protect the religious rights of counselors and therapists. (Id. at ¶ 27). Similarly, Dr. James T. "Dale" Berry, a psychologist

---

[6] Governor Haslam signed the Therapist Bill into law on April 27, 2016 and assigned a public chapter number on May 2, 2016. (Pl.'s Stat. Mat. F., ¶ 11).

who runs a Christian counseling service named Ebenezer Counseling Service,[7] testified that his sincerely held principles that required legislative protection:

> . . . start with the Ten Commandments. And then we could start with values in the scriptures. And the one I named earlier, technically, it's called fornication. It's where an unmarried couple wants sex therapy. That would be fornication.

(Id. at ¶ 31). Indeed, the Therapist Bill's sponsor and others continued to promote its necessity for protecting counselors' religious beliefs while debating it. (Id. at ¶ 34). After these debates, on April 11, 2016, the Senate amended its version of the Therapist Bill to conform with the House's version by substituting the words "sincerely held principles" for "sincerely-held religious beliefs." (Id. at ¶ 35). Despite the change in language, the Therapist Bill's "Bill Summary" on the General Assembly's website continues to state:

> This bill provides immunity from liability for counselors and therapists who refuse to counsel a client as to goals, outcomes, or behaviors that conflict with a sincerely held religious belief of the counselor or therapist.

(Id. at ¶ 5).

Further, it appears that the specific religious beliefs the Therapist Bill seeks to protect are nothing more than the ability to discriminate against the LGBTQ community.[8] The ACA labeled it "Hate Bill 1840." (Id. at ¶ 75). The Southern Poverty Law Center designated one of its

---

[7] As a psychologist (and unlike other professionals at Ebenezer Consulting Services), Dr. Berry is neither a member of the ACA nor subject to the ACA's Code of Ethics. (Pl.'s Stat. Mat. F., ¶ 33).

[8] The State of Tennessee has a history of passing laws that disadvantage homosexuals, but has never passed a law that disadvantages heterosexuals. (Pl.'s Stat. Mat. F., ¶ 6). And during Dr. Shawn Spurgeon's January 27, 2016, testimony about the religious beliefs the Therapist Bill seeks to protect, Chairman Williams expressed disbelief that certain individuals could harbor religious beliefs that interracial marriage is inappropriate. (Tr. In re: Senate Bill 1556 and House Bill 1840 at Vol. I. at 132:20-133:14, attached as **Exhibit 1**). Respectfully, this disbelief, when coupled with the fact that no witness testified about a religious (or sincerely held) belief to be protected by the Therapist Bill that is not directed towards members of the LGBTQ community, further indicates that the true purpose of the Therapist Bill is to empower individuals with certain religious beliefs to discriminate against members of the LGBTQ community.

leading proponents, FACT, as an LGBTQ hate group in 2010.[9] (Pl.'s Stat. Mat. F., ¶ 67). Another supporter of the Therapist Bill, the Alliance Defending Freedom, is a nonprofit organization that supports national "religious freedom laws" and "bathroom bills" which target transgender students and that once labeled Matthew Shepard's murder a hoax to promote the gay agenda. (Id.)

Dr. Berry – who wrote a March 29, 2016, letter to Governor Haslam advocating for passage of the Therapist Bill, introducing himself as "a member at Cedar Springs Presbyterian," and stating his belief that the Therapist Bill is necessary to protect his (and others) "core religious values"[10] – is the only witness (other than Copas) Defendant identified as possessing information that it may utilize to support its defenses.[11] (Pl.'s Stat. Mat. F., ¶¶ 36, 43). Dr. Berry and others at Ebenezer Counseling Services treat (or are at least willing to treat) LGBTQ persons for things like depression, but will not, by way of example, provide marriage counseling or sex therapy to homosexuals. (Id. at ¶ 37).

---

[9] Consistent with that designation, in an August 25, 2011, blog post, its president, David Fowler, decried the American Psychiatric Association's decision to remove homosexuality from its list of mental disorders. (Pl.'s Stat. Mat. F., ¶ 67). And he called transgender students "abnormal" when he testified in favor of an anti-transgender bathroom bill that was pending before the General Assembly. (Id.).

[10] In his deposition, Dr. Berry acknowledges that many of his sincerely held principles come from his religious beliefs. (Pl.'s Stat. Mat. F., ¶ 42).

[11] In his deposition, Dr. Berry testified that he informed Mr. Graham, another proponent of the Therapist Bill that he was willing to testify. (Pl.'s Stat. Mat. F., ¶ 47). At the time of his testimony, Dr. Graham was the director of a Christian counseling center located in Williamson County, Tennessee. (Id. at ¶ 19). Like Dr. Berry, Mr. Graham testified to the General Assembly that the Therapist Bill's passage was needed to "protect [his] right to honor the core beliefs of [his] faith . . ." (Id. at ¶ 20). He further testified "[W]hat is important to consider here is the goal of the client, what the client is choosing to accomplish through counseling, and whether I would be violating my faith in supporting certain goals." (Id. at ¶ 49).

According to Dr. Berry, people seeking counseling (including, without limitation, people who might be at a risk of hurting themselves or others) are often anxious about doing so and sometimes downplay their symptoms, issues, or problems when first meeting with a therapist. (Id. at ¶ 38). He also acknowledges that being referred to another therapist could embarrass a patient. (Id. at ¶ 39). Yet Ebenezer Counseling Services' marketing materials including, without limitation, its website, contain no mention that its counselors might choose not to treat a patient because of its counselors' sincerely held principles. (Id. at ¶ 40). Indeed, Dr. Berry admits that the patient likely would not be made aware that Ebenezer Counseling Services would refer him to another counselor until they met in person.[12] (Id. at ¶ 41).

Neither Dr. Berry nor anyone else associated with Ebenezer Counseling Services, have referred a patient to another organization because of his or her sincerely held principles. (Id. at ¶ 44). Nevertheless, he believes it is important that therapists have the "freedom" to do so. (Id. at ¶ 45). And when asked whether that freedom is more important than a patient's right to therapy by the counselor of his or her choosing, he responded, in part, that patients have no such right. (Id. at ¶ 46).

---

[12] The General Assembly defeated an amendment to the Therapist Bill which would have required counselors to provide public notice of which patients their sincerely held principles precluded them from seeing. (Pl.'s Stat. Mat. F., ¶ 28). While this amendment was debated, the Therapist Bill's sponsor, Representative Howell, argued that requiring this posting would discriminate against those with "sincere religious beliefs . . . by forc[ing] a counselor to publicly put up a sign to proclaim what is already granted to them in the First Amendment." (Id. at ¶ 29). Similarly, the General Assembly failed to pass an amendment which would have prevented a therapist from charging a patient after referring that patient to another counselor solely because of the therapist's sincerely held beliefs or from instituting a lawsuit to recover any unpaid fee. (Id. at ¶ 30). As a result of these failures, Dr. Berry testified that Ebenezer Counseling Services has no prohibition on charging patients for being referred to other counselors. (Id. at ¶ 32).

### III.     SUMMARY JUDGMENT STANDARD

The standard for summary judgment is no different in a lawsuit challenging the constitutionality of a statute than in any other case. *See, e.g.*, *Coles by Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 376 (6th Cir. 1999). For summary judgment to be granted, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(c). If the material facts are undisputed, one party is entitled to summary judgment. *Id.*

### IV.     THE THERAPIST BILL VIOLATES THE ESTABLISHMENT CLAUSE

Respectfully, Copas is entitled to summary judgment because the undisputed facts demonstrate that the Therapist Bill violates the Establishment Clause, as applied to the states through the Due Process Clause of the Fourteenth Amendment,[13] which provides that "Congress shall make no law respecting an establishment of religion thereof" and affords protection against "the three main evils of 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" U.S. Const. amend. I, IV; *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971); By granting certain Christian counselors with rights not afforded to others, it violates the well-established principles that government may neither favor nor disfavor any particular religion or religion in general, and that legislative accommodations for religious beliefs that harm other private citizens are not constitutional. *Bd. of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 696 (1994); *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 709 (1985).

---

[13] The Establishment Clause incorporated to the states in *Everson v. Board of Education*, 330 U.S. 1, 8 (1947).

In 1947, the Supreme Court interpreted the Establishment Clause by stating:

> [T]he "establishment of religion clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can . . . force [a person]to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs . . . [T]he [Establishment] [C]lause . . . was intended to erect a "wall of separation between church and state."

*Everson*, 330 U.S. at 15-19. This mandates governmental neutrality between religion and religion, and religion and non-religion. *McCreary Cnty., Ky. v. ACLU*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). And means that there is an "absolute prohibition" on a State's ability to "pass laws which aid one religion or that prefer one religion over another." *Larson v. Valente*, 456 U.S. 228, 246 (1982) (quoting *Everson*, 330 U.S. at 15); *Epperson*, 393 U.S. at 106.

To pass muster under the Establishment Clause, government conduct, even if facially neutral, must:

- be driven by a secular purpose;
- have a principal or primary effect that neither advances nor inhibits religion; and
- not create an excessive entanglement between government and religion.

*Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *Smith v. Jefferson Cty. Bd. of School Comm'rs*, 788 F.3d 580, 589, 6th Cir. 2015); *Kunselman v. W. Reserve Local Sch. Dist.*, 70 F.3d 931, 932 (6th Cir. 1995). While failing one of these prongs renders a law unconstitutional, the Therapist Bill fails all three because:

- its legislative history demonstrates that it has no secular purpose;
- it was created solely to advance the religious beliefs of certain Christian counselors by giving them the right to rely on their religious beliefs to discriminate against certain patients and potential patients; and

- it excessively entangles government and religion.

Accordingly, it is unconstitutional.

### A. The Therapist Bill was not driven by a secular purpose.

The first prong of the Supreme Court's test – whether the challenged law has a secular purpose – examines the government's motivation in advancing the challenged law and asks whether the government intended it to advance or inhibit religion. *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987). Courts generally give deference to a legislature's stated purpose for passing a law. *Coles by Coles*, 171 F.3d at 384. However, that stated purpose must be "genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty.*, 545 U.S. at 864. In other words, for a law to pass Constitutional muster, it requires the government to show more than "the mere existence of some secular purpose." *Lynch v. Donnelly*, 465 U.S. 668, 690-691 (1984) (O'Connor, J., concurring). Courts considering the constitutionality of a law under this prong must objectively consider "the traditional external signs that show up in the text, legislative history, and implementation of the statute . . ." *McCreary Cnty.*, 545 U.S. at 862.

Findings that a secular purpose did not drive government action often occur when "the government action itself bespoke its purpose," leaving courts to draw the "commonsense conclusion" from "openly available data" that religion motivated the law. *McCreary*, 545 U.S. at 862-63. In other words, the legislative history of facially neutral statutes may demonstrate that the statute violates the Establishment Clause. *Larson v. Valente*, 456 U.S. at 254; *see also Adland v. Russ*, 307 F.3d 471, 480-81 (6th Cir. 2002) (holding that a state's stated legislative purpose of reminding its citizens of the Biblical foundations of its laws did not justify building of a monument featuring the Ten Commandments at its capitol building).

Respectfully, this is a case where the General Assembly's action "bespoke its purpose." Unlike the Presidential Proclamation at issue in *Trump v. Hawaii*, 138 S. Ct. 2392, 2416-2423 (2018), which, on its face, purported to be nothing more than the President exercising his ability to control the entry of unvetted foreign nationals into the United States, the Therapist Bill does not invoke a national security interest or otherwise purport to protect the rights of citizens to the detriment of individuals who do not enjoy Constitutional Rights. Further, unlike the challenge to that Presidential Proclamation, Copas bases his challenge on language the General Assembly (and the Therapist Bill's promoters) used before and after passing the Therapist Bill, as opposed to words the President used on the campaign trail. Indeed:

- the Therapist Bill's "Bill Summary," which is found on the General Assembly's website, currently states that it provides immunity for counselors who fail to treat patients because of the counselor's "sincerely held religious belief;"

- the House did not amend its version of the Therapist Bill by changing the phrase "sincerely-held religious beliefs" to "sincerely held principles" until March 16, 2016, and the Senate did not adopt this change until April 11, 2016;

- the Therapist Bill's legislative history, which includes testimony from its proponents and statements by General Assembly members, demonstrates that its purpose is to promote the religious beliefs of certain Christians; and

- during deliberations, no one advocated for a non-religion based sincerely held belief that the Therapist Bill would protect or a non-religious belief that did not disproportionately affect members of the LGBTQ community.

(Pl.'s Stat. of Mat. F., ¶¶ 5, 13-14, 35).

Respectfully, this court may not "turn a blind eye to the context in which" the Therapist Bill arose. *McCreary Cnty.*, 545 U.S. at 866. The General Assembly drafted it to provide certain Christian counselors with something other counselors do not have – the ability to rely on their religious beliefs to refuse service to patients and potential patients, most notably those who are part of the LGBTQ community. As the Establishment Clause does not allow the State of

Tennessee to prefer these counselors' religious beliefs over others, any claim that it has a secular purpose is a sham and the Therapist Bill is unconstitutional. *Edwards*, 482 U.S. at 587-88 (finding that the legislative history of a bill prohibiting the teaching of evolution rendered the bill's stated purpose of protecting academic freedom a sham).

### B. The Therapist Bill's principal or primary effect is to advance certain religious beliefs.

The second prong of the test is objective, and is commonly described as, when viewed by a reasonable observer, "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring); *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002). This is because endorsement "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch* at 688. Simply put, the question for courts to decide is whether, when considered in its particular setting, the challenged law is likely to be perceived as an endorsement or disapproval of religion by adherents, nonadherents to that religion, and reasonable observers. *Kunselman*, 70 F.3d at 932 (citations omitted). A challenged law is unconstitutional if either the purpose or effect of the government activity is to endorse or disapprove of religion. *Lynch*, 465 U.S. at 690.

Under this prong of the test, the relevant question – whether, when considered in the relevant setting, the Therapist Bill is likely to be perceived as the State of Tennessee's endorsement of religion – is answered in the affirmative. Its legislative history reveals that the sole purpose of the Therapist Bill is to endorse and advance the religious beliefs of certain counselors by passing a law which gives them rights not afforded to other counselors, including, without limitation, the right to discriminate against those who do not share their beliefs, such as

members of the LGBTQ community (whom the General Assembly frequently treats as second class citizens). In fact, no witness testified that he or she desired the Therapist Bill's passage for any reason other than to protect his or her religious beliefs. Consistent with that legislative history, at least one academic paper addresses the impact of the Therapist Bill on the LGBTQ community, while Copas is aware of no papers addressing its effect on other communities. (Pl.'s Stat. Mat. F., ¶ 4). Finally, the Bill Summary posted on the General Assembly's website states that "[t]his Bill provides immunity from liability for counselors and therapists who refuse to counsel a client as to goals, outcomes, or behaviors that conflict with a sincerely held religious belief of the counselor or therapist." (Id. at ¶ 5).

Respectfully, these facts show that the General Assembly endorsed certain religious beliefs over others when it passed the Therapist Bill. Indeed, it is akin to the statute which guaranteed certain religious employees the right not to work on the Sabbath which the Supreme Court struck down in *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1984). Like that statute, the Therapist Bill provides certain individuals with rights that others do not enjoy solely because of their religious beliefs. *Cf. id* at 708-09[14] Accordingly, it is unconstitutional.

### C. The Therapist Bill fosters excessive government entanglement with religion.

Finally, determining whether a law fosters excessive government entanglement with religion requires courts to analyze "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon*, 403 U.S. at 615. First, courts examine whether there is any administrative relationship or interaction between church and state. *Lynch*, 465 U.S.

---

[14] In so ruling, the Supreme Court quoted Judge Learned Hand's statement "[t]he First Amendment . . . gives no one the right to insist that in pursuit of their own interests, others must conform their conduct to his own religious necessities." 472 U.S. at 710 (quoting *Otten v. Baltimore & Ohio R. Co.*, 205 F.3d 58, 61 (2nd Cir. 1953).

at 684; *ACLU v. City of Birmingham*, 791 F.2d 1561, 1565-66 (6th Cir. 1986). They then analyze the level of political divisiveness the law may cause. Lemon, 403 U.S. at 622-23. Indeed, "political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. *Id.* at 622.

The Therapist Bill checks all of the boxes for a law that fosters excessive entanglement with religion. It was promoted by Christian anti-LGBT groups (and not the ACA) and by passing it, the General Assembly created an exception to Tennessee laws that benefit only certain religious counselors (to the detriment of those who do not share their beliefs). Additionally, it created a great deal of political divisiveness. Indeed, in opposing its passage, the ACA, which moved its 2017 National Convention from Nashville to protest its passage, referred to the Therapy Bill as "Hate Bill 1840," and called it an "unprecedented attack" on the counseling profession; while certain Christian groups (the majority of whom have no relationship to counselors) lauded its passage. (Pl.'s Stat. Mat. F. ¶¶ 67, 75). Respectfully, as the Therapist Bill provides certain individuals' rights not enjoyed by those who do not share their religious beliefs, it excessively entangles church and state, and is unconstitutional.

## V. COPAS HAS STANDING TO PROSECUTE THIS LAWSUIT.

Finally, the Court's May 25, 2018, Order (Doc. 21) ruled that Copas has standing to prosecute this lawsuit. Since then, nothing has happened that would change the Court's holding. Indeed, since then, the allegations in the Complaint upon which the Court relied are now undisputed. (Pl.'s Stat. Mat. F. ¶¶ 52, 64-66).

As this Court previously found in its Memorandum and Order, Copas is a gay Tennessean, who is in continuing need of therapy. (Doc. 21, p. 14). Due to the Therapy Bill, Copas feels marginalized and excluded and feels that the State deems him unworthy of

guaranteed access to service. (Id. pp. 3, 11). The Court previously found that this sufficiently concrete enough to confer standing upon Copas.

Additionally, as this Court previously found, the feelings of marginalization and exclusion "directly and personally impact [him as] a gay man suffering from PTSD and Chronic Adjustment disorder who has sought psychological counseling in the past but is now discouraged from doing so…" (Id. p. 12). The Therapy Bill causes him to feel as if he is not worthy of being guaranteed counseling services from a counselor of his own choosing in his home state of Tennessee. (Id. p. 13). Further, as this Court previously found, Copas changed his behavior as a result of the "stigmatic and psychological injuries." (Id. p. 13). Because of this and the fact that Copas seeks to vindicate his own rights and is a gay Tennessean in continuing need of therapy, this Court found that the injury was sufficiently particularized to confer standing upon Copas. (Id. p. 15).

Further, in his deposition, Copas testified about the Therapist Bill being part of a nationwide "reaction to the national focus on same-sex marriage and transgender rights," and that it was "initially conceived as an effort to protect religious counselors in the wake of the legalization of gay marriage." (Pl.'s Stat. Mat. F., ¶ 7). Similarly, he testified about the Therapist Bill promoting certain Christian beliefs over his beliefs and allowing licensed counselors to discriminate against him because he is gay. (Id. at ¶ 73). Accordingly, when asked if a therapist has discriminated against him because he is gay, Copas testified that:

> I don't think I have had any therapist discriminate against me. But I also knew I was working with them being held to a code of ethics that didn't allow them to discriminate against me for being gay.

(Id.) Then when asked why he believes a therapist is now more likely to refuse to treat him than before the Therapist Bill passed, he responded:

[W]ell, I believe that it went from zero without fear of punishment to now however many wanted this law to come into existence. So it's whatever from zero, and one is too much.

(Id. at ¶ 74).

The following colloquy indicates that Defendant concedes that the Therapist Bill injured Copas by causing him to fear reengaging with a therapist:

Q: So how exactly has this bill injured you other than you have this subjective fear of going to a therapist?

A: Well, I'm reluctant to minimize injuries that don't necessarily lead me to seek therapy. There are mental health injuries that happen. So for me, I was injured when the bill was passed. It doesn't look like a broken bone or cut skin, but my injuries are in here.

Q: And you're pointing to your head?

A: I'm pointing to my head.

Q.: And that's it? That's the only reason its injured you?

A: I believe for whatever reason, the way that I have perceived and reacted to this event in the same way that a trauma can make an effect differently on each of us, it has affected my trust in the State's ability to protect me as a gay man. So it has maligned my trust in mental health, my trust in the State.

Q: And just so we're clear, the event that you're referring to is the passage of this bill into law?

A. Yes.

Q. And you're saying this maligned your trust with the State to be able to protect you as a gay man?

A. Yes, I would say that. When I see laws - - law after law after law put into writing to protect people against me, at least included in the law, whether it is the sole intent - - but it protects people against me, in my perception.

. And it's hard to continue to remain hopeful that this can be a safe state to live, a place where I can walk down Market Square holding Ricky's hand. Things like this put me further in the closet. It fuels more internalized homophobia that I then have a response to, sometimes positive, sometimes negative.

Q. Have you walked with Mr. Shaw down Market Square, holding hand in hand?

A. On Pride Fest.

Q. That's it?

A. I can't remember another time that I have held Ricky's hand when it wasn't in another place. I don't feel safe doing that in Tennessee.

Q. And you felt that way before this bill was passed?

A. Probably. Confirmation matters, whether it's legitimate or not.

Q What is your basis for claiming that the State looked at a select group of religious counselors who oppose the LGBT community?

A. I believe that's based on the fact that many or that some religious counselors do not agree in changing this or that they need that - - this protection. In fact, I'm not actually aware of any therapist being sued beforehand because of this.

Q. Because of what?

A. Because of discrimination against someone's - - on the basis of their sexual orientation. I'm not aware.

But I do know there were religious organizations that stepped up stating that they were opposed to this.

Q. Opposed to what?

A. Opposed to the passage of this law.

Q. Okay. There were religious organizations who are opposed to the passage of the therapist bill?

A. Yes.

Q. Okay. But getting back to - - the particular question is: What is your factual basis for claiming that the State looked at a select group of religious counselors who opposed the LGBT community in particular?

A. I will say my perception matters.

Q. It's just your perception?

> A. To say that the LGBTQ community is not worthy of being guaranteed counseling services.
>
> Q. And who said that?
>
> A. It's my perception.
>
> Q. Who said that?
>
> A. I don't know.
>
> Q. Just so we're clear, you are not aware of anybody ever saying that LGBT community is not worthy of protection in the context of this bill. Am I correct about that?
>
> A. Not that - - I'm not aware if anyone has - - I'm not aware of who said that at this point.
>
> Q. Did anybody say that?
>
> A. I cannot recall accurately.

(**Id.** at ¶ 76).

## VI.     CONCLUSION

In conclusion, the Therapist Bill's summary accurately depicts what it is – the General Assembly's attempt to empower counselors with certain religious beliefs to discriminate against some patients. There is no secular purpose for this law, it endorses the religious beliefs of those counselors over the beliefs (or non-beliefs) of others, and it fosters an excessive entanglement between church and state. Accordingly, Copas respectfully requests that this Court find that the Therapist Bill violates the Establishment Clause, as applied to the states through the Due Process Clause of the Fourteenth Amendment, and declare it to be unconstitutional.

Respectfully submitted,


*s/ Christopher W. Cardwell*
Christopher W. Cardwell
Mary Taylor Gallagher
M. Thomas McFarland
GULLETT, SANFORD, ROBINSON & MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
(615) 244-4994 (Telephone)
(615) 256-6339 (Facsimile)
ccardwell@gsrm.com
mtgallagher@gsrm.com
tmcfarland@gsrm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2019, a true and exact copy of the foregoing has been filed electronically and may be accessed through the Court's electronic filing system. The following will receive a copy through the Court's electronic filing system:

Dawn Jordan, BPR 20383
Stephanie Bergmeyer, BPR 27096
Office of Tennessee Attorney General
Civil Justice Section
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2500

<em>s/ Christopher W. Cardwell</em>