BLEU COPAS,                 )

                        )

       Plaintiff,          )

                        )

v.                        )     **Case No. 3:17-cv-01447**

                        )     **Judge Aleta A. Trauger**

BILL LEE, in his official capacity as   )
GOVERNOR OF THE STATE OF       )
TENNESSEE,                 )

                        )

       Defendant.       )

## MEMORANDUM

Pending before the court are a Motion for Summary Judgment (Docket No. 35) filed by the defendant, the Governor of the State of Tennessee, Bill Lee,[1] as well as a Motion for Summary Judgment (Docket No. 38) filed by the plaintiff, Bleu Copas. For the reasons set forth herein, Copas's motion will be denied, Lee's motion will be granted, and the case will be dismissed for lack of standing.

## BACKGROUND

Tennessee regularly adopts the Code of Ethics promulgated by the American Counseling Association (the "ACA") as the State's official Code of Ethics governing licensed counselors and

---

[1] This suit was originally filed against former governor Bill Haslam, in his official capacity. Federal Rule of Civil Procedure 25(d), which governs suits against public officers, states: "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution." The court has not ordered substitution since Governor Lee took office, and the parties have not addressed it. The court will now proceed with Governor Lee, in his official capacity, as the appropriate defendant in this matter.

therapists.[2]  (Docket No. 40-1 at 4.)  In 2014, the ACA amended its Code of Ethics to provide, in

relevant part:

> Values Within Termination and Referral
>
> Counselors refrain from referring prospective and current clients based solely on the counselor's personally held values, attitudes, beliefs, and behaviors. Counselors respect the diversity of clients and seek training in areas in which they are at risk of imposing their values onto clients, especially when the counselor's values are inconsistent with the client's goals or are discriminatory in nature.[3]

(Docket No. 40-2 at 6.)

In response to the ACA's amendment, Tennessee Senator Jack Johnson introduced Senate

Bill 1556 (the "Bill") on January 11, 2016.[4]  (Docket No. 35-1 at 3.)  One of Senator Johnson's

constituents—a faith-based counselor—brought the amendment to Johnson's attention and urged

Johnson to safeguard the "personally-held beliefs" of counselors.  (*Id*. at 4.)  The constituent was

concerned that, under the amendment, he might be subjected to state board discipline (such as

license suspension) or to private litigation, were he to refer a patient due to his own religious or

personally-held beliefs.  (*Id*.)  A group of counselors and therapists from across the state raised

similar concerns.  (*Id*. at 69.)  Early versions of the resulting legislation protected counselors'

---

[2] The difference between a counselor and a therapist is not relevant for the purposes of this opinion.
[3] Rule A.11.b. previously provided:

> Inability to Assist Clients
>
> If counselors determine an inability to be of professional assistance to clients, they avoid entering or continuing counseling relationships.  Counselors are knowledgeable about culturally and clinically appropriate referral resources and suggest these alternatives.  If clients decline the suggested referrals, counselors should discontinue the relationship.

(Docket No. 35-3 at 6.)
[4] House Bill 1840, the corresponding bill in the Tennessee House of Representatives, was introduced later that month by Representative Dan Howell.

"sincerely-held religious belief[s]" by immunizing counselors who refused to counsel clients as to "goals, outcomes, or behaviors that conflict[ed]" with such beliefs.  (*Id*. at 71.)

Legislative committees deliberated on the Bill from early January to late March 2016. (Docket No. 45 at 6.)  On March 16, 2016, the Bill was amended to replace the phrase "sincerely held religious belief[s]" with "sincerely held principles."  (Docket No. 35-1 at 173.)   Governor Haslam signed the Bill into law on April 27, 2016.  (Docket No. 22 at 2.)  The final version is codified at Tennessee Code Annotated Section 63-22-302 and provides:

> (a) No counselor or therapist providing counseling or therapy services shall be required to counsel or serve a client as to goals, outcomes, or behaviors that conflict with the sincerely held principles of the counselor or therapist; provided that the counselor or therapist coordinates a referral of the client to another counselor or therapist who will provide the counseling or therapy.
>
> (b) The refusal to provide counseling or therapy services as described in subsection (a) shall not be the basis for:
>
>> (1) A civil cause of action; or
>>
>> (2) Criminal prosecution.
>
> (c) Subsections (a) and (b) shall not apply to a counselor or therapist when an individual seeking or undergoing counseling is in imminent danger of harming themselves or others.

Tenn. Code. Ann. § 63-22-302.

Copas is a gay Tennessean and a distinguished army veteran.  (Docket No. 45 at 26–27.) He resides just outside of Knoxville in Powell, Knox County, Tennessee.  (Docket No. 35-9 at 2 (Deposition of Bleu Copas).)  He works in Knoxville.  (*Id*.)  He was honorably but involuntarily discharged in 2006 pursuant to "Don't Ask, Don't Tell," a military policy that prohibited openly gay Americans from serving.  (Docket No. 45 at 27.)  He has a master's degree in counseling and is a certified peer recovery specialist.  (Docket No. 35-9 at 6.)  As a peer recovery specialist, he teaches, leads peer support groups, and provides one-on-one mentoring sessions.  (*Id*. at 7–8.)  He

is currently in the process of obtaining a license to practice as a professional counselor. (*Id*. at 6–7.)

Copas first sought therapy in his early college years. (Docket No. 45 at 26.) He has engaged in various forms of therapy with multiple practitioners over the course of his adult life. (Docket No. 35-9 at 13.) He suffers from Post-Traumatic Stress Disorder ("PTSD") and Chronic Adjustment Disorder ("CAD"), for which he saw therapist Dr. Dan Williams from 2014 to 2016. (Docket No. 45 at 28.) Copas has not sought therapy since 2016. (Docket No. 42 at 29.)

Copas alleges that the Bill was conceived to protect religious counselors and therapists. (Docket No. 40-6 at 2 (Declaration of Bleu Copas).) He notes that several Christian advocacy organizations supported and promoted the Bill and asserts that the Bill comports with a history of state-sponsored discrimination against the Tennessee LGBT community. (*Id*.) He states that he knows "from [his] activism" that the Bill "is part of a widespread reaction to the national focus on same-sex marriage and transgender rights." (*Id*.) His activism includes work with the Tennessee Equality Project ("TEP"), an organization founded for the advancement of LGBT rights. (Docket No. 42 at 31.) He has worked with TEP for many years and previously served as the organization's vice president (*Id*. at 32), but he has distanced himself recently due to the organization's failure to support him in bringing this lawsuit (Docket No. 35-9 at 27).

Copas alleges that he has not engaged in therapy since 2016 because the Bill's passage has inflicted stigmatic and psychological harm on him. (Docket No. 35-9 at 53.) He claims that the Bill's passage has "affected [his] trust in the State's ability to protect [him] as a gay man." (*Id*. at 54.) The Bill's passage makes him feel unworthy of protection and causes him to question his

ability to walk down the street holding his husband's hand.[5]  (*Id*. at 54.)  He "want[s] to re-engage

in therapy, but fear[s] that a therapist will refuse to treat [him] because of [his] sexuality."  (Docket

No. 40-6 at 2.)  He claims that prior, to the Bill's passage, he knew that, if he required treatment,

a counselor could not refuse to treat him based solely on his sexuality.  (*Id*. at 3.)  However, "[n]ow

that the Bill has passed, unlike all other Tennesseans, LGBT persons (like [Copas]) no longer know

that a counselor will not discriminate against them."  (*Id*.)  He elaborates:

> As the Bill does not require counselors to publicly disclose whether they treat
> patients who seek outcomes that conflict with their sincerely held principles (i.e.
> whether the counselors refuse to treat members of the LGBT Community because
> of the counselor's sincerely held principles), neither I, nor any other LGBT person
> in Tennessee has the security of knowing that, after summoning the courage to seek
> treatment and make an appointment with a counselor, the counselor will actually
> provide the necessary treatment.

(*Id*. at 3–4.)  He states that the Bill's passage increased his fear of referral due to his sexuality from

zero to some positive, unspecified level.  (Docket No. 40-11 at 26.).

Copas has never been denied treatment by a counselor or therapist.  (Docket No. 35-9 at

56.)  He does not know of anyone who has been rejected for treatment since the Bill's passage.

(*Id*.)  He states that he spends "probably every moment of [his] life imagining that at any point

[he] will be discriminated against because [he is] gay."  (*Id*. at 14.)  He acknowledges that, because

of his fear of discrimination, he has always been reticent in initially seeking treatment.  (*Id*. at 15.)

He describes his fear as being derived, at least in part, from internalized homophobia that he has

dealt with all his life.  (*Id*. at 43.)

Copas has made little, if any, attempt to find a new therapist since the Bill's passage.  He

states that he has "started that process internally to see if [he is] ready to start with a [new]

---

[5] Copas acknowledges that he also felt unsafe holding his husband's hand in public prior to
passage of the Bill.  (Docket No. 40-11 at 29.)

therapist" (*Id*. at 24), and that he has "flirted with the idea and talked [himself] out of" it (*Id*. at 32). He has sought referrals for other patients but has not reached out to any of those therapists on his own behalf, because he knows them personally and does not feel comfortable asking them for help. (*Id*.) He has not asked any of his former therapists for referrals, despite Dr. Williams' offer to provide him one. (*Id*. at 24.) Copas's reluctance to ask for recommendations stems from what he describes as the "stigma" associated with mental illness. (*Id*. at 37.) He explains:

> I don't feel comfortable, one, calling and saying I need therapy. I mean, there is a stigma that's still embedded in me in terms of my own mental illness. And I like to pretend that I have it all together, and like the fact that people imagine I can help them, but I am not always the best at helping myself.

(*Id*. at 31.) Likewise, he does not feel comfortable asking his LGBT friends for help because it is hard for him, as a visible member of his local LGBT circle, to talk about his need for mental health care. (*Id*.) In addition, Copas is wary of investing in a new therapy relationship that might end in referral because he finds it difficult to educate therapists on his background and to place himself in emotionally vulnerable situations. (*Id*. at 52–53.) He describes these feelings as "paralysis by analysis" and as being "crippled by [his] paranoia." (*Id*.) He has not availed himself of a United States Department of Veterans Affairs program—the Choice program, which arranges therapy sessions for veterans with third-party practitioners—because he has heard negative reactions from veterans who have participated. (*Id*. at 35.)

Copas has not made any other efforts to find LGBT-friendly therapists. (*Id*. at 30.) Despite being "computer literate" and familiar with internet search engines, he has conducted no research related to LGBT-friendly therapists in the region where he lives and works. (*Id*. at 28.) At his deposition, Copas was questioned about various resources with which he stated that he had no prior familiarity. (*Id*. at 26–32.) The first was a TEP initiative called "Counseling

Unconditionally," hosted on the TEP website. (Docket No. 35-10.) The Counseling Unconditionally webpage states:

> Tennessee HB 1840, the Counseling Discrimination bill, highlights the need for counselors, therapists, psychologists, psychiatrists, and social workers to speak out for inclusive practices. We urge any practitioner to endorse the statement below. Those who endorse will be listed on our website and receive a Tennessee Open For Business window cling for display in their offices. . . .
>
> **As counselors, therapists, psychologists, psychiatrists, and social workers serving clients in Tennessee, we affirm that we do not discriminate based on sexual orientation or gender identity, and we will not use our own sincerely held principles as a reason to turn clients away.**

(*Id*. at 1 (emphasis in original).) At the time of Copas's deposition, the initiative had 1,086 endorsements. (*Id*.) Despite being involved with TEP for years (including at one time as its Vice President) and following the organization on Facebook, Copas stated that he had not seen the Counseling Unconditionally initiative before and was unaware that it existed. (Docket No. 35-9 at 27.) Counseling Unconditionally is referenced and described in a University of Tennessee study submitted by Copas as an exhibit in this lawsuit. (Docket No. 40-4 at 22.) The study states:

> After Gov. Haslam signed the bill, the TEP inaugurated the "Counseling Unconditionally" project . . . which lists mental health service providers who have pledged they do not discriminate against LGBT+ clients and "will not use our own sincerely held principles as a reason to turn clients away."

(*Id*. at 22–23.) Copas acknowledges that he obtained a copy of the study, has seen it, and is familiar with its contents. (Docket No. 40-4 at 11–12.)

Counsel for the State also questioned Copas about a directory of LGBT-friendly therapists in Knoxville, housed on the website psychologytoday.com. The directory includes dozens of therapists and contains the following disclosure:

**Gay (LGBTQ) Therapists**
We should make clear that not all the therapists listed here are gay themselves. Rather, they specialize in helping with aspects of being gay in Knoxville or

homosexual.  They provide help for gay couples in gay relationships, gay issues and issues that affect gay life.

If you're gay or are looking for help with gay issues in Knoxville or for a Knoxville gay therapist these professionals provide gay counseling and gay friendly care for gays or lesbians.

(Docket No. 35-13 at 10–11.)  Counsel for the State also provided Copas with psychologytoday.com directories of LGBT-friendly therapists in Clinton, Tennessee (Docket No. 35-12) and in Anderson County, Tennessee (35-11),[6] both of which contain identical disclosures and include multiple pages of therapist listings.  Copas recognized only some of the therapists in the directories.  (Docket No. 35-9 at 30.)  He has not reached out to any of those therapists for referrals or recommendations.  (*Id.* at 31.)  He does not think that the therapists who have endorsed Counseling Unconditionally or who are listed in the psychologytoday.com directories discriminate against LGBT people.  (*Id.* at 32.)

Copas seeks declaratory relief that the Bill is unconstitutional and injunctive relief enjoining Governor Lee from enforcing it.  (Docket No. 2 at 12.)  On December 12, 2017, Governor Haslam moved to dismiss on the sole basis that Copas could not establish standing to sue because his Amended Complaint did not allege a concrete, particularized injury in fact.  (Docket No. 9.)  On May 25, 2018, the court granted the motion in part, dismissing Copas's Equal Protection claim for lack of standing.  The court did not dismiss his Establishment Clause claim, finding that the Amended Complaint[7]—taken in the light most favorable to Copas—adequately pleaded a concrete and particularized injury.  (Docket No. 21.)  The parties now both seek summary judgment in their favor.

---

[6] Both Clinton and Anderson County are within a 20-mile radius of Powell.  Copas votes at the courthouse in Clinton.  (Docket No. 35-9 at 29.)

[7] (Docket No. 2.)

## LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.*

Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine"

only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

<u>**ANALYSIS**</u>

Lee again challenges Copas's standing to sue. Lee argues that the record—as opposed to the pleadings on which Copas's Motion to Dismiss was decided—demonstrates that Copas has not established that he has suffered an injury sufficient to confer subject matter jurisdiction.

### 1. General standing principles

In order to establish subject matter jurisdiction, a litigant must show, among other things, that he has standing to litigate a particular claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). Standing is a "threshold determinant[ ] of the propriety of judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). Copas, as the plaintiff, bears the burden of establishing standing. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The elements of standing are threefold: the plaintiff must establish (1) injury in fact, (2) causation, and (3) redressability. *Steel Co.*, 523 U.S. at 103. The injury-in-fact component requires the plaintiff to "allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal citations omitted). For an injury to be sufficiently distinct, or "particularized," it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) (internal quotation marks omitted).

When a plaintiff seeks injunctive relief, the plaintiff must demonstrate that there is a non-speculative, imminent threat of ongoing or repeated injury to establish that there is a redressable injury-in-fact. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 966 (6th Cir. 2009)). "Redressability . . . requires 'that prospective relief will remove the harm,' and the plaintiff must show 'that he personally would benefit in a tangible way from the court's intervention.'" *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 670 (6th Cir. 2007) (quoting *Warth v. Seldin*, 422 U.S. at 505). In determining whether a plaintiff has standing, "the court must be careful not to decide the question on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013); *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."), *aff'd by District of Columbia v. Heller*, 554 U.S. 570 (2008).

### 2. Establishment Clause standing principles

The Establishment Clause "guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)). "The First Amendment contains no textual definition of 'establishment,' and the term is certainly not self-defining." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 874–75 (2005). But "when the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *Id* at 860. Because the Establishment Clause is

"primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature[,]" *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1250 (9th Cir. 2007), violations often beget nebulous harms. *See Heard v. Finco*, No. 18-2371, 2019 WL 3072151, at *2 (6th Cir. July 15, 2019) ("[U]nlike economic injuries, spiritual injuries are hard to quantify.").

Establishment Clause injury assessments are thus difficult. *See Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 504–05 (5th Cir. 2007) ("The concept of injury for standing purposes is particularly elusive in Establishment Clause cases."); *see also Suhre v. Haywood County*, 131 F.3d 1083, 1085 (4th Cir. 1997) (same). The Supreme Court has exacerbated the uncertainty by providing no template for analyzing Establishment Clause injuries. *See Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067, 2101 (2019) (Gorsuch, J. concurring) ("The truth is, the fault lies here."); *see also Trump v. Hawaii*, 138 S.Ct. 2392, 2416 (2018) (expressly declining to "decide whether the claimed dignitary interest establishes an adequate ground for standing," because the plaintiffs alleged an additional, non-spiritual injury). "Lower courts are left to find a threshold for injury and determine somewhat arbitrarily whether that threshold has been reached." *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489–90 (2d Cir. 2009), *cert. denied*, 559 U.S. 971 (2010). Our analysis must be "tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer." *Suhre*, 131 F.3d at 1086. The Constitution "requires that we keep in mind the myriad, subtle ways in which Establishment Clause values can be eroded, and that we guard against other different, yet equally important, constitutional injuries. One is the mere passage . . . of a policy that has the purpose and perception of government establishment of religion." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314 (2000) (internal citation and quotation marks omitted).

### 3. Copas lacks standing

In denying Haslam's Motion to Dismiss, the court found that Copas had adequately pleaded a particularized injury based, in large part, on his allegation that he wished to re-engage in therapy but was unable to do so due to the Bill's stigmatizing effects. (Docket No. 21 at 13.) A particularized injury is distinct from one "shared with 'all members of the public.'" *United States v. Richardson*, 418 U.S. 166, 178 (1974) (quoting *Ex parte Lévitt*, 302 U.S. 633, 634 (1937) (per curiam)). The Supreme Court's seminal decision in *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) is instructive. In *Valley Forge*, an advocacy group and several of its employees sued to prevent the transfer of federal property to a Christian nonprofit that planned to use the land for a secular educational institution. *Id.* at 485. The Court found no standing because the plaintiff had not personally suffered sufficient injury. *Id.* at 472. The Court was strongly influenced by two facts: the plaintiffs were citizens of D.C., Maryland, and Virginia; and they learned of the transfer of federal property in Pennsylvania only through a news release. *Id.* "[The Sixth Circuit] and other circuits have read *Valley Forge*'s language as depending in no small part on the directness of the harm alleged." *Am. Civil Liberties Union of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 489 n.3 (6th Cir. 2004). Hence, courts evaluating particularization look to whether a plaintiff "is feeling the direct, painful effects . . . in his everyday life." *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 585 (4th Cir. 2017), v*acated and remanded sub nom. Trump v. Int'l Refugee Assistance*, 138 S.Ct. 353 (2017). Directness gets to "the essence of the standing inquiry," which is "whether [plaintiffs] have alleged such a personal stake in the outcome of the controversy" to illuminate the issue in contest. *Larson v. Valentine*, 456 U.S. 228, 238–39 (1982).

Courts have diverged on how to adjudge whether a plaintiff has a personal stake sufficient to confer standing in an Establishment Clause case. Some courts of appeal—including the D.C.,[8] Second,[9] and Fifth[10] Circuits—have adopted a "confrontation" or "direct exposure" requirement for plaintiffs asserting as an Establishment Clause injury the expressive effects of a governmental law or practice. Under this approach, "a plaintiff is 'directly affected,' as opposed to indirectly affected, by an unconstitutional governmental action only when a plaintiff's injury arises out of plaintiff's immediate and personal confrontation with the object of that governmental action— most commonly a government-sponsored religious expression or a governmental policy, statute, or regulation grounded in a 'religious' tenet or principle." *Montesa*, 836 at 197–98 (internal citation omitted). Thus, for example, in *Barber v. Bryant*, the Fifth Circuit found no standing for plaintiffs challenging a Mississippi law that prohibited the state from taking any "discriminatory action" against individuals acting in accordance with certain "religious beliefs or moral convictions." 860 F.3d at 351 (quoting 2016 Miss. Law HB 1523 § 2). The Fifth Circuit reasoned that standing based on the plaintiffs' stigmatic injuries would be "indistinguishable" from standing based on a generalized interest, because one "cannot confront statutory text." *Id*. at 353. The D.C. Circuit reached a similar result using similar reasoning in *In re Navy Chaplaincy*, finding that a group of Protestant Navy chaplains did not have standing to bring a suit alleging that the Navy's operation of its retirement system discriminated in favor of Catholic chaplains. *See* 534 F.3d at 764–65 ("When plaintiffs are not themselves affected by a government *action* except through their abstract offense at the *message* allegedly conveyed by that action, they have not shown injury-in-

---

[8] *See In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008).
[9] *See Montesa v. Schwartz*, 836 F.3d 176 (2d Cir. 2016).
[10] *See Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017).

fact to bring an Establishment Clause claim, at least outside the distinct context of the religious display and prayer cases.") (emphasis in original).

Other courts of appeal have not taken such a stringent approach. The Ninth Circuit[11] has found that individuals can confront statutory text. For example, in *Catholic League for Religious & Civil Rights v. City & County of San Francisco*, a group of San Francisco Catholics sued the city and county for adopting a resolution denouncing a Cardinal's directive that the local archdiocese not place children for adoption in homosexual households. 624 F.3d at 1047. The Ninth Circuit, sitting *en banc*, found standing, in part, because the plaintiffs had "come in contact with the resolution." *Id.* at 1053. The Ninth Circuit also noted that the resolution had forced the plaintiffs to alter their behavior by "curtail[ing] their political activities to lessen their contact with defendants." *Id.*

The Fourth Circuit's decision in *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) suggests that one way to bridge the gap between a generalized grievance and a particularized harm is to show alteration of the plaintiff's behavior. The Fourth Circuit held that the Mosses, a parent and student, had standing to sue after changing their conduct in response to a letter they received about an opportunity for school credit through off-campus Christian religious instruction. *Moss*, 683 F.3d at 606 ("Robert and Melissa Moss testified that they changed their conduct in adverse ways as a result of their perceived outsider status. Robert became less involved as a volunteer parent at Spartanburg High School, and Melissa decided to go to a college outside of South Carolina because, in part, she felt excluded in her home community. For purposes of standing, these 'change[s in] personal conduct on account of' allegedly unlawful conduct are

---

[11] *See Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 624 F.3d 1043 (9th Cir. 2010).

15

indicative of injury.").  The Fourth Circuit found no standing for another student and parent, the Tilletts, who did not receive a letter about the off-campus instruction.  *Id*.  The Fourth Circuit concluded that the Tilletts' allegations amounted "to little more than simple disagreement with the wisdom of the School District's policy", partly because they did not alter their conduct in response to the school's policy.  *Id*.

The Sixth Circuit has not adopted in an Establishment Clause case either of the approaches outlined *supra*.  However, in a Religious Freedom Restoration Act case decided shortly after the court issued its Memorandum denying in part Haslam's Motion to Dismiss, the Sixth Circuit assessed standing for alleged stigmatic injuries.  *See New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 585–86 (6th Cir. 2018).  Citing Establishment Clause precedent, the Sixth Circuit found standing for plaintiffs who suffered stigmatic injury and changed their conduct in response to governmental action.  *Id*.  The Sixth Circuit reasoned:

> Some Plaintiffs allege injury in the form of stigma, ridicule, peer pressure, and exposure to religious dogma, which the Government argues are insufficient for Article III standing.  The Complaint lists certain allegations specific to individual Plaintiffs, and it is true that some individualized allegations state merely that a Plaintiff feels offense or fears ridicule.  The Complaint, however, is not limited to these individual allegations.  Read in full, the Complaint's allegations go beyond mere "observation of conduct with which one disagrees."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc*., 454 U.S. 464, 485 (1982) (denying standing to taxpayers who alleged their tax payments were used in violation of the Establishment Clause but did not allege any direct connection or exposure to the misuse).  The Complaint alleges not only that Plaintiffs take offense at the Motto's inscription on currency, but also that the Government has burdened all the Plaintiffs' religious beliefs by pressuring them to alter personalized conduct in which they regularly engage.  *Cf. Washegesic v. Bloomingdale Pub. Sch*., 33 F.3d 679, 683 (6th Cir. 1994) (concluding that Establishment Clause plaintiff had standing because he "has continuing direct contact with the object at issue," and therefore the injury was "not remote, vicarious or generalized as in *Valley Forge*").

*Id*.

The court reads *New Doe* as consistent with approach typified by *Moss*. Indeed, several other courts of appeal also look for changes in conduct in determining standing for challenges to government policies on the basis of stigmatic harm. *See, e.g.*, *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 808 (7th Cir. 2011) (finding no standing for plaintiffs challenging presidential proclamation designating a National Day of Prayer) ("Plaintiffs have not altered their conduct one whit or incurred any cost in time or money. All they have is disagreement with the President's action."); *Awad v. Ziriax*, 670 F.3d 1111, 1123 (10th Cir. 2012) (finding standing for plaintiff challenging state constitutional amendment forbidding courts from using Sharia law, in part because the amendment would have inhibited the plaintiff's practice of his religion).

Copas cannot show standing under either the stringent "direct exposure" approach or the more lenient approach that considers alteration of personal conduct. He has not been directly affected by the Bill's passage because he has not been referred or rejected therapy based on his sexual orientation. *See In re Navy Chaplaincy*, 534 F.3d at 760 ("If plaintiffs had alleged that the Navy discriminated against them on account of their religion, plaintiffs would have alleged a concrete and particularized harm sufficient to constitute injury-in-fact for standing purposes. But plaintiffs have conceded that they themselves did not suffer employment discrimination on account of their religion. They have conceded that the Navy did not deny them any benefits or opportunities on account of their religion."). Copas has thus not suffered any direct exposure, as required by the "confrontation" line of cases to confer standing.

Nor can he rely on his alleged change in conduct to show that his marginalization is sufficiently particularized. In its Memorandum denying in part Haslam's Motion to Dismiss, the court accepted as true Copas's allegation that he wished to re-engage in therapy but was prevented from doing so by the Bill's passage. But the full record now before the court significantly

undermines that allegation. His testimony describes a number of barriers to re-initiating therapy, all unrelated to the Bill's passage. Copas acknowledges that he has always been reticent in initially seeking treatment from every therapist he has ever had. (Docket No. 35-9 at 15.) One reason is the stigma that Copas associates with mental illness:

> I don't feel comfortable, one, calling and saying I need therapy. I mean, there is a stigma that's still embedded in me in terms of my own mental illness. And I like to pretend that I have it all together, and like the fact that people imagine I can help them, but I am not always the best at helping myself.

(*Id*. at 31.) Another reason, by his own characterization, is his near-disabling internalized homophobia that he has dealt with all his life. (*Id*. at 43.) As a result, he spends "probably every moment of [his] life imagining that at any point [he] will be discriminated against because [he is] gay." (*Id*. at 14.) In addition, Copas worries about placing himself in an emotionally vulnerable situation, as required for initiating a new therapy relationship, and about putting in the effort to build such a relationship. (*Id*. at 52–53.)

The record also calls into question whether Copas currently wishes to re-engage in therapy. He states that he has "started that process internally to see if [he is] ready to start with a [new] therapist" (*Id*. at 24) and that he has "flirted with the idea and talked [himself] out of" it. (*Id*. at 32). But he has made no actual effort to find a new therapist. He has not asked any of his former therapists for referrals, despite his most recent therapist, Dr. Williams, offering to provide him one. (*Id*. at 24.) He has conducted no internet research on LGBT-friendly therapists in the greater Knoxville region. (*Id*. at 28.) He has not tried the Choice program run by the Department of Veterans Affairs, which would provide him with a third-party therapist or counselor. (*Id*. at 35.) He has not reached out to anyone he knows in the therapist community for a referral, or to any of his LGBT friends, because he does not feel comfortable asking them for help. (*Id*.)

In sum, Copas's testimony paints a picture of someone who has for many years struggled with the debilitating effects of mental illness and discrimination. But the stigmas and fears he describes all long predate the Bill's passage. His allegation that the Bill's passage increased his fear of referral due to his sexuality "from zero," (Docket No. 40-11 at 26), is belied by his acknowledgement that he has always been reticent to engage in therapy and has always been afraid of discrimination in every aspect of his life. And his claim that he wants to re-engage in therapy is at odds with his admission that he has only started an internal deliberative process to determine whether he is ready to start a new therapy relationship and with the lack of even prefatory steps taken to initiate that process.

Even if the Bill's passage has exacerbated Copas's fear of discrimination so as to make him less likely to attempt to re-engage in therapy, he cannot show that such dissuasion persists, as he must to seek declaratory and injunctive relief. "When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396 (6th Cir. 2019) (quoting *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). "Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief . . . because the fact that a harm occurred in the past 'does nothing to establish a real and immediate threat that' it will occur in the future, as is required for injunctive relief." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983)). Thus, assuming that Copas has previously not re-engaged in therapy due to the Bill's passage, he must also show the Bill's passage currently keeps him from re-engaging in therapy or will do so in the future.

Copas cannot make such a showing based on the record. The Counseling Unconditionally initiative and psychologytoday.com directories provide extensive lists of counselors and therapists near Copas's home and workplace willing to treat (and, in many instances, specializing in treating) LGBT patients. (Docket Nos. 35-10–35-13.) These professionals unequivocally declare that they will not refer patients based on the patients' sexual orientation. (*See, e.g.*, Docket No. 35-10 at 1 ("As counselors, therapists, psychologists, psychiatrists, and social workers serving clients in Tennessee, we affirm that we do not discriminate based on sexual orientation or gender identity, and we will not use our own sincerely held principles as a reason to turn clients away.").) Copas states that he did not know that either of these resources existed prior to his deposition.[12] He now knows. Copas testified that he recognized only some of the therapists in the directories, (Docket No. 35-9 at 30), and that he does not think that the listed therapists discriminate against LGBT people (*Id*. at 32). He cannot plausibly suggest that the Bill's passage now limits him from re-engaging in therapy, should he wish to do so. Copas bears the burden of establishing standing and, in light of the TEP initiative and the psychologytoday.com directories, he cannot show that the Bill's passage will prevent him from receiving treatment, should he wish to seek it.

Absent a present or future change in conduct due to the Bill's passage, Copas cannot establish standing. His injury amounts only to a generalized grievance shared, at the very least, by all LGBT individuals in Tennessee. Copas acknowledges as much: "Now that the Bill has passed, unlike all other Tennesseans, LGBT persons (like [Copas]) no longer know that a counselor will not discriminate against them." (Docket No. 40-6 at 3.) Such a diffuse harm

---

[12] This, despite Copas having formerly served as TEP's Vice President, having been involved with the group for years, following the organization on Facebook, and having seen (and submitted into the record as part of this litigation) the University of Tennessee study that references the Counseling Unconditionally initiative. (Docket Nos. 35-9 at 27, 40-4 at 11–12.)

constitutes the type of generalized grievance that is insufficient to confer standing. *See Valley Forge*, 454 U.S. at 485. This is not to suggest that a future litigant might lack standing if he suffered a more particularized harm, such as by being referred by a therapist due to the litigant's sexual orientation or showing that the Bill prevented the litigant from re-engaging in desired therapy. Copas has shown neither and thus lacks standing.

## CONCLUSION

For the foregoing reasons, Copas's Motion for Summary Judgment (Docket No. 38) will be **DENIED** and Lee's Motion for Summary Judgment (Docket No. 35) will be **GRANTED**. Copas's Establishment Clause claim will be dismissed due to lack of standing.

An appropriate order will enter.

ENTER this 19th day of July 2019.

ALETA A. TRAUGER
United States District Judge